UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TERRY L. WIGINGTON, ) | CASE NO. 5:13CV322 |
| ) | |
| Plaintiff, ) | MAGISTRATE JUDGE GEORGE J. |
| ) | LIMBERT |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN[1], ) | MEMORANDUM OPINION AND ORDER |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Terry L. Wigington ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

### I. **PROCEDURAL AND FACTUAL HISTORY**

On August 1, 2009, Plaintiff applied for SSI and DIB, alleging disability beginning October 1, 2006. ECF Dkt. #11 ("Tr.") at 130-139.[2] Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010 ("DLI"). Tr. at 17. The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 88-91. Plaintiff requested an administrative hearing, which was held on April 20, 2011. Tr. at 47-80. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel, and Robert Breslin, a vocational expert

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

("V.E."). On May 10, 2011, the ALJ issued a Decision denying benefits. Tr. at 15-23. Plaintiff filed a request for review, which the Appeals Council denied on December 10, 2012. Tr. at 1.

On February 13, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On June 27, 2013, with leave of the Court, Plaintiff filed a brief on the merits. ECF Dkt. #15. On July 29, 2013, Defendant filed a brief on the merits. ECF Dkt. #16. A reply brief was filed on August 20, 2013. ECF Dkt. #18.

**II.** **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was thirty-four years of age on the alleged onset date and thirty-eight years of age at the hearing, suffered from status post open reduction internal fixation for right hip fracture, and arthralgias of the left knee, back, and right hip, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 17. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525, 404.1526, §416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 18.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. §§404.1567(b) and 416.967(b), except that he can stand and/or walk with normal breaks for six hours out of an eight-hour workday; he can occasionally climb ramps and stairs, and can occasionally kneel, crouch and crawl, but he can never climb ladders, ropes, or scaffolds; he can occasionally operate foot controls; and he must have a sit/stand option. Tr. at 18.

The ALJ ultimately concluded that Plaintiff could perform his past work as a salesman at a sporting goods store, as well as the representative occupations of order clerk, assembler, and inspector. Tr. at 21-22. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

**III.** **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

    2.       An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

    3.       If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

    4.       If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

    5.       If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*,

581 F.3d 399, 407 (6th Cir.2009) (citations omitted).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V. ANALYSIS

Plaintiff advances three arguments in this appeal. First, Plaintiff contends that the ALJ violated the treating physician's rule when he did not give controlling weight to the opinion of Tim Conlan, M.D., a one-time examining physician who provided a medical source statement regarding Plaintiff's physical limitations.  Next, Plaintiff contends that the ALJ failed to undertake a proper analysis at Step Three of the sequential analysis, because Plaintiff meets a Listing.  Finally, Plaintiff asserts that the ALJ erred when he did not credit Plaintiff's testimony of disabling pain at the hearing.

### A. Medical evidence

The medical evidence in the record is sparse. Plaintiff testified at the hearing that he did not seek medical treatment because he did not have medical insurance. On September 29, 2009, Plaintiff presented to Total Living Center Free Clinic with hip and knee pain, which he claimed that he had suffered ever since his automobile collided with a tree in 2004. Tr. at 230.  He reported that he experienced stomach pain with the use of ibuprofen . His height measured 5'11" and he weighed 261 pounds. A physical examination revealed a scar on his right hip and left knee effusion. Plaintiff was assessed with obesity, status post hip surgery, and questionable early left knee osteoarthritis. He was prescribed lidocaine patches, baclofen, and tramadol. Labs and x-rays were ordered and he was encouraged to apply for assistance in obtaining Celebrex.

Roughly sixteen months later, on March 16, 2011, Plaintiff presented to the emergency room at Aultman Hospital after having fallen several days earlier. Tr. at 274. He was noted to have a history of prior right hip pinning.  He rated his pain at eight out of ten, which worsened with ambulation and palpation. His pain was constant and nothing alleviated it. On examination, Plaintiff exhibited tenderness to palpation of his right hip with minimal swelling. Tr. at 275. He had

-4-

tenderness to active flexion and extension of the hip and tenderness with log roll.  X-rays of Plaintiff's right hip revealed degenerative joint disease with post-surgical changes and fractures of two screws of his prior open reduction internal fixation.  Tr. at 275.

Joel Balcom, M.D., the examining physician, observed that Plaintiff had a right fracture of two screws from his prior surgery and may have a fracture of the inferior rami.  Dr. Balcom further observed that Plaintiff was "probably going to need a total hip replacement to help curative at this point in time and need extensive physical therapy." Tr. at 277. Plaintiff was given crutches and made non-weight bearing to the right lower extremity. Tr. at 275.  Plaintiff consulted with Social Services to obtain Medicaid.  Tr. at 277.

On March 24, 2011, approximately one week after Plaintiff's emergency room visit, he presented to Dr. Conlan, an orthopedic surgeon, for a consultation regarding his right hip. Tr. at 281. Plaintiff reported that he suffered constant pain that interfered with his activities of daily living and his sleep. Plaintiff also reported numbness and tingling in his right thigh and lumbar region. His pain increased with climbing stairs, sitting down, sitting to standing, standing, walking long periods, weather change, and lying on the right hip. He was using a walker. Tr. at  282. Dr. Conlan opined that Plaintiff "needs to have a hip replacement" and stated that he was to "come back once he gets his finances in order." Tr. at 282.

Dr. Conlan completed a Medical Statement Regarding Hip Problems on April 27, 2011, in which he opined that Plaintiff suffers with chronic hip pain, limitation of motion of the hip, joint space narrowing of the hip, chronic hip stiffness, hip instability, hip contracture, bony destruction of the hip, an inability to ambulate effectively, and a history of reconstructive surgery. Tr. at 286. Dr. Conlan opined that Plaintiff cannot sit or stand for even fifteen minutes per day, cannot work for even one hour a day, and can never lift even five pounds occasionally, never bend, stoop, balance, or climb ladders and can only occasionally climb stairs. Further, Dr. Conlan characterized Plaintiff's pain as "marked," which was defined in the questionnaire as indicating "serious limitation, severely limits ability to function (i.e., on task 48%-82% in an 8 hr work day)." Tr. at 286.

-5-

### B. State Agency Assessments

On October 13, 2009, Plaintiff presented for an examination by Murrell Henderson, D.O. He reported applying for disability because of his inability to tolerate his right hip pain. Tr. at 231. Plaintiff found it difficult to walk more than thirty minutes, stand more than thirty minutes, or sit for more than thirty minutes. He developed left knee pain due to overcompensation as a result of his right hip pain. On examination, Plaintiff had normal range of motion and strength of the left hip, but the right was decreased. Tr. at 232. He was able to stand on his toes and heels and to squat to about ninety degrees, but was unable to tandem walk, and had decreased sensation in the right lateral thigh. Plaintiff had no muscle atrophy. Tr. at 237. Dr. Henderson observed that Plaintiff did not use an assistive device for walking, smoked one and a half packs of cigarettes per day, and had last smoked marijuana a few weeks ago. Tr. at 231. X-rays of Plaintiff's right hip on October 12, 2009 revealed moderate to advanced degenerative changes with sclerosis and osteophyte formation. Tr. at 234.

Dr. Henderson assessed Plaintiff as having arthralgias of the right hip; status post open reduction, right hip fracture; and arthralgias of the left knee and low back. Tr. at 232. Dr. Henderson concluded that Plaintiff had satisfactory range of motion of the upper extremities and left lower extremities, but his gait was antalgic due to arthropathy in the right hip. He had no deficits in the use of his upper extremities, and his lower back showed no deficits in range of motion or strength. Dr. Henderson opined that Plaintiff could likely tolerate most sedentary jobs or even some jobs requiring light lifting and walking short distances, but Plaintiff's ability to use foot controls would be hampered by hip pain.

Dr. Henderson's impression included arthralgias, right hip; status post open reduction, right hip fracture; and arthralgias, left knee and low back. Dr. Henderson observed an "antalgic gait due to arthropathy in the right hip." Right hip x-rays revealed status post open reduction internal fixation from complex prior acetabular fracture, moderate to advance degenerative changes of the right hip with sclerosis and osteophyte formation, and no acute fracture. Tr. at 234. Dr. Henderson opined that Plaintiff "could likely tolerate most sedentary jobs or even some jobs requiring light lifting and walking to short distances. The use of foot controls in the use of the machinery may be hampered by the hip pain." Tr. at 232.

-6-

On November 9, 2009, one-time consultative examiner, Michael J. Harvan, Ph.D. completed a psychological evaluation and noted that Plaintiff's conversation was of normal rate, his affect was not constricted, blunted or flat, and he made eye contact with him approximately sixty percent of the time. Tr. at 243. Plaintiff stated that he had gained forty pounds in two years and that he has trouble falling asleep because of his hip pain. When Plaintiff was asked about preoccupying thoughts, he responded that he thinks about "being crippled" and not having any income or insurance. Tr. at 243. Plaintiff reported that his thinking had been "foggier" since his accident and his ability to concentrate had diminished as a result of the accident. On examination, Plaintiff's remote long-term memory functioning was good and his short-term memory functioning was fair. Tr. at 244. Dr. Harvan set forth no diagnosis and offered a GAF score of 75. Tr. at 245. Dr. Harvan ultimately opined that none of Plaintiff's mental abilities were impaired. Tr. at 245-46.

Suzanne Castro, Psy.D., opined on November 30, 2009 that Plaintiff did not have a medically determinable mental impairment. Tr. at 248. On April 19, 2010, Paul Tangeman, Ph.D. affirmed Dr. Castro's November 30, 2009 opinion. Tr. at 270.

W. Jerry McCloud, M.D., opined on December 24, 2009 that Plaintiff retained the ability to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk and sit for a total of six hours in an eight-hour workday, occasionally operate right foot controls, never climb ladder/rope/scaffolds, and occasionally climb ramp/stairs, kneel, crouch, and crawl. Tr. at 262-269. On May 1 ,2010, Walter Holbrook, M.D. affirmed Dr. McCloud's December 24, 2009 opinion. Tr. at 271.

### C.    Hearing testimony

Plaintiff testified that he injured his hip when the automobile he was driving collided with a tree in March or April of 2004. Tr. at 52. According to Plaintiff's testimony, he had "[fallen] asleep, passed out," and he attributed the accident to the fact that he was working two jobs at the time. Tr. at 52. When the ALJ asked if Plaintiff had been drinking the night of the accident, Plaintiff responded that he was charged with driving under the influence of alcohol. Tr. at 53. Plaintiff testified that he had three DUIs but that he had stopped drinking. He had nine years of sobriety as of the date of the hearing. Tr. at 58. Following his accident, he and his employer, a nursing home,

agreed that he could no longer perform his job, which required carrying things and walking across wet floors. Tr. at 53.

Plaintiff explained that he cared for his elderly grandmother following the car accident in 2004, and "tried working several jobs buy [he] couldn't sit for prolonged period [sic] or lift or perform [his] duties." Tr. at 51. As of the date of the hearing, Plaintiff was still his grandmother's caretaker. Tr. at 51. He moved into her home when he could no longer afford rent after the car accident. She allows him to stay with her in exchange for assistance around the house. Tr. at 52.

Plaintiff conceded that he did not seek treatment in 2005, and that he took over the counter pain medication. Tr. at 55. He took twelve to sixteen ibuprofen tablets per day, which caused frequent stomach problems. Tr. at 55. Plaintiff conceded that he did not seek treatment in 2006 or 2007. Tr. at 55-56. He testified that he was "at home most of the time just like [he is] now." Tt. at 56.

Plaintiff went to the free clinic in 2009 because "everybody told [him] to go." Tr. at 58. He further explained that the clinic "didn't really do anything for [him]." Tr. at 59. He was given prescription pain medication and patches for his hip. Plaintiff did not seek treatment in 2010, he stated that he tried to go to free clinics since he fell but the "just didn't really seem like they could help [him] out much with what [he's] got." Tr. at 62. He testified that every time he went to a hospital, "they'd tell [him] to go to another one." Tr. at 70. According to Plaintiff's testimony, he was told to take ibuprofen because that is all that can be done when someone does not have insurance.

Plaintiff testified that, when he went to the emergency room after he fell (roughly a month before the hearing), he was told that all of the screws in his right hip were shattered, and he was instructed to use crutches. Tr. at 62. Plaintiff further testified that he had been using crutches since 2006 as needed (he lives in a three-story home), but since his emergency room visit he has been using them religiously. Tr. at 71.

Plaintiff has had constant pain since the accident but he testified that, after the fall in 2011, it became excruciating. Tr. at 63. According to Plaintiff's testimony, he has some arthritis, and he

-8-

is developing problems with his left knee, because he places all of his weight on his left leg.  Tr. at 66. He also has difficulty with concentration due to his constant pain. Tr. at 79.

Plaintiff testified that the emergency room physician encouraged him to lose weight and prescribed Vicodin, which Plaintiff described as a "24-pill thing."  Tr. at 64.  He further explained that "they knew [he] was coming to [the hearing] and they said that after [his] hearing they'd determine what, you know, they could do for [him], if [he] could get in a pain clinic." Tr. at 64.

Plaintiff testified that he managed his family's pizza shop in 2006, but it went out of business. Tr. at 60.  Prior to managing the pizza shop, Plaintiff was a supervisor of a machine shop for nine years. Tr. at 61. Plaintiff's counsel argued that Plaintiff tried a "sit-down job" with Star Air/ammunitionstore.com  but was unsuccessful, even though it was a part time position. Tr. at 67. Plaintiff explained that he could not stand for hours.  Tr. at 69.  After he stood for an hour to two hours, Plaintiff's pain became unbearable.

At the hearing, the ALJ asked Plaintiff to explain his alleged onset date, because it did not coincide with the his hip injury in 2004, or with the first treatment notes in the record, which are dated September 4, 2009.  Tr. at 50-51. Plaintiff's counsel explained that Plaintiff had a surgical repair of his hip in 2004, which caused his current limitations, but, because he had tried unsuccessfully to perform full-time work after his surgery through the better part of 2006, his alleged onset date is October 1, 2006.

### D. The ALJ's Decision

The ALJ relied upon Plaintiff's activities of daily living in concluding that his limitations were not of a degree sufficient to prohibit full-time work.  The ALJ cited the fact that Plaintiff cares for his grandmother, his nephew (who he frequently prepares for school in the morning), and two dogs.  The record further establishes that he cooks, cleans, grocery shops, mows the lawn, hunts, fishes, and camps. Tr. at 20.  The ALJ also cited Plaintiff's successful return to gainful employment after his 2004 hip surgery.  Tr. at 20.

The ALJ further predicated his decision upon the fact that Plaintiff did not seek medical treatment from 2005 to 2008, or in 2010.  Plaintiff visited the free clinic in 2009, but did not return, despite the fact that the clinic provided prescription pain medication.  Plaintiff offered no testimony

regarding the effectiveness of the prescription pain medication. However, the record established at the time of the hearing that Plaintiff takes no prescribed medication, undergoes no physical therapy, and only uses over-the-counter medication.

Furthermore, despite more than one recommendation that Plaintiff seeks financial assistance through government programs, i.e., Medicaid, or other subsidized medical programs, there is no evidence that Plaintiff pursued low-cost or no cost options for surgery, as he did in 2004 with respect to his first hip surgery.[3]

Plaintiff's 2011 visits to the emergency room and to Dr. Conlan were prompted by his fall. However, the ALJ concluded that the medical evidence from Plaintiff's emergency room visit did not demonstrate that Plaintiff had a severe medically-determinable impairment that had lasted or was expected to last twelve months. The ALJ opined that there was no evidence to show that Plaintiff would not improve with treatment and repair of the damaged hardware in his right hip. Tr. at 21.

### E. Treating Physician Rule

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.  A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007).  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

---

[3]SSR 82-59 discusses a claimant's failure to follow a treating physician's recommendation of surgery. Among the exceptions to the general rule that a claim may be denied where the claimant fails to follow the treatment advice of his physician, SSR 82-59 recognizes a claimant's inability to afford the recommended treatment. SSR 82-59 reads, in pertinent part, "The individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable. Although a free or subsidized source of treatment is often available, the claim may be allowed where such treatment is not reasonably available in the local community. All possible resources (*e.g.*, clinics, charitable and public assistance agencies, etc.), must be explored. Contacts with such resources and the claimant's financial circumstances must be documented.)

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Commisioner of Social Security,* 378 F.3d 541, 544 (6th Cir.2004) quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Commisioner of Social Security,* 486 F.3d 234, 243 (6th Cir.2007), citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth

-11-

Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377. However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Plaintiff correctly argues that the ALJ did not analyze or even mention Plaintiff's surgical consultation with Dr. Conlan, nor did he analyze or even mention Dr. Conlan's medical source statement. Plaintiff contends that Dr. Conlan is a treating physician and that his opinion should be afforded controlling weight, however, the record shows that Dr. Conlan saw Plaintiff on only one occasion for the surgical consultation, and, therefore, he is not a treating physician.

Nonetheless, Dr. Conlan's medical source statement, along with his consultative examination and the treatment notes from Plaintiff's emergency room visit in 2011, are the only evidence in the record that establish Plaintiff's medical condition following his fall. Consequently, the ALJ's failure to consider Dr. Conlan's opinion, at first blush, appears to constitute error. However, while it is true that the ALJ did not consider Dr. Conlan's medical source statement, the statement itself is contravened by virtually all of the evidence in the record. Dr. Conlan opined that Plaintiff cannot sit or stand for even fifteen minutes per day, cannot work for even one hour a day, and can never lift even five pounds occasionally, never bend, stoop, balance, or climb ladders and can only occasionally climb stairs. Plaintiff's admitted activities of daily living, even after his fall in 2011, belie Dr. Conlan's dire conclusions regarding his limitations.

Even assuming *arguendo* that Dr. Conlan's opinion should be afforded controlling weight, Dr. Conlan offered no prognosis with respect to Plaintiff's physical limitations following the recommended hip surgery. In other words, it is not clear from the medical source statement that Plaintiff would meet the requirements for disability following surgery, that is, that surgery could not be expected to restore Plaintiff's ability to work.

-12-

The Sixth Circuit recognized in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541(6th Cir.2004) that, in some circumstances, a violation of the treating physician rule might be "harmless error" where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *Id.* at 547. Here, Dr. Conlan's opinion is contradicted by substantial evidence in the record, and fails to establish that Plaintiff has a "severe impairment," as that phrase is defined by the SSA. Accordingly, even if Dr. Conlan is considered a treating physician, the ALJ's failure to consider his opinion constitutes harmless error.

### F.     Listing 1.02(A)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir.2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii) ). An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment. *Id.* at 415; *Hunter v. Astrue*, No. 1:09CV2790, 2011 WL 6440762, at *3 (N.D.Ohio Dec.20, 2011);*May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, at *8-9 (N.D.Ohio June 1, 2011). Nevertheless, it is the claimant's burden to show that he meets or medically equals an impairment in the Listings. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir.1987) (*per curiam*).

The ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the Listing, with particular consideration of the Listings at 1.02 and 1.03. Plaintiff contends that he meets the Listing at 1.02(A) based upon Dr. Conlan's medical source statement and x-rays taken after his fall in 2011 in the record. Listing 1.02, captioned "Categories of Impairments, Muscloskeletal," reads, in pertinent part:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

-13-

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; . . .

Listing 1.00B(2) reads, in pertinent part:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Plaintiff contends that he meets a Listing for the first time in this appeal. When a claimant is represented by counsel, typically it is counsel's responsibility to structure the claimant's case in a way that claims of disability are adequately explored. See *Carrico v. Comm'r of Soc. Sec.*, No. 5:09CV2083, 2011 WL 646843, at *8 (N.D.Ohio Jan.21, 2011) (citing *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir.1997)). Moreover, the regulations "do[ ] not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue," and there is no heightened articulation standard at step three when the ALJ's findings are supported by substantial evidence. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir.2006).

Upon reviewing the ALJ's opinion, the Court concludes that the ALJ's finding that Plaintiff's hip problems do not meet or medically equal an impairment in the Listings is supported by substantial evidence. As previously stated, Dr. Conlan's conclusions regarding Plaintiff's limitations are contravened by substantial evidence in the record. Moreover, even assuming *arguendo* that Dr. Conlan has correctly assessed Plaintiff's limitations following Plaintiff's fall, Dr. Conlan provided no opinion regarding the effect of the recommended hip replacement upon Plaintiff's ability to perform light work. Accordingly, the ALJ did not err in concluding that Plaintiff does not meet a Listing.

Plaintiff cites *Reynolds*, supra, in support of his contention that this case should be remanded for the ALJ to explicitly discuss Listings 1.02(A). *Reynolds*, however, is distinguishable. In

*Reynolds*, "the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments." *Reynolds*, 424 F. App'x at 415. The court explained that, "in this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence [the claimant] put forth could meet [Listing 1.04]." *Id.* at 416. Here, Plaintiff has not made such a showing. Indeed, Plaintiff relies upon the broken screws in his hip and Dr. Conlan's medical source statement. As previously stated, the ALJ did not err in disregarding Dr. Conlan's opinion, insofar as his opinion is not supported by substantial evidence in the record, and does not provide any insight into whether Plaintiff's injuries constitute a sever impairment.

Courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality." *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir.2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) ). Plaintiff has not provided an adequate basis to conclude that remand for the ALJ to more fully explain his Step Three analysis might lead to a different result. Accordingly, this assignment of error is not well taken.

### G. Credibility

Finally, Plaintiff contends that the ALJ erred when he did not credit Plaintiff's testimony regarding his debilitating pain. When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40.

Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ found that Plaintiff's impairments could be expected to produce pain and symptoms but not the kind of debilitating pain and symptoms that Plaintiff alleged. It should be noted that the ALJ did not totally reject Plaintiff's allegations, but rather, he determined that Plaintiff's allegations of the intensity, duration and limiting effects of his symptoms were not substantiated by the objective medical findings or other evidence in the record.

An ALJ is not required to accept a plaintiff's own testimony regarding his pain. *See Gooch v. Secretary of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir. 1987). Although Plaintiff testified that he suffers debilitating pain as a result of his first hip injury, the ALJ correctly observed that Plaintiff's activities of daily living belie his testimony.

Next, Plaintiff contends that the ALJ impermissibly relied upon Plaintiff's failure to seek medical attention in discrediting his testimony. To the contrary, Plaintiff had access to the free clinic, which provided prescription pain medication. Despite the availability of prescription pain medication, Plaintiff did not return to the free clinic, but, instead, expressed frustration that he was told to take over-the-counter pain medication because he did not have medical insurance. Plaintiff's testimony was contradictory with respect to the treatment he received at the free clinic, and he offered no explanation, other than his testimony that he was sent to various sources of treatment, to explain his failure to pursue low-cost or no-cost medical care. Accordingly, the ALJ did not err in discrediting Plaintiff's testimony regarding debilitating pain.

## **VI. CONCLUSION**

Substantial evidence in the record supports the ALJ's conclusion that Plaintiff was not disabled prior to his fall in 2011. Medical evidence relating to Plaintiff's condition after his fall in

2011 fails to establish that his injury constituted a severe impairment. Therefore, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: March 26, 2013

                                        */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE